L1K1REYA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        18 Cr. 454 (KPF)

5    EFRAIN REYES,

6              Defendant.               Oral Argument
                                        (Via Teleconference)
7    ------------------------------x

8                                       January 20, 2021
                                        11:03 a.m.
9

10   Before:

11                   HON. KATHERINE POLK FAILLA,

12                                       District Judge

13
                            APPEARANCES
14
     AUDREY STRAUSS
15        United States Attorney for the
          Southern District of New York
16   BY:  FRANK J. BALSAMELLO
          Assistant United States Attorney
17
     MARLON G. KIRTON, P.C.
18        Attorneys for Defendant
     BY:  MARLON G. KIRTON, ESQ.
19
     MILLER KORZENIK SOMMERS RAYMAN LLP
20        Attorneys for Movants NY Daily News, Stephen Rex Brown
     BY:  MATTHEW LEISH, ESQ.
21

22

23

24

25

L1K1REYA

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE DEPUTY CLERK:  Counsel, please state your name for |
| 3 | the record, beginning with the government. |
| 4 | MR. BALSAMELLO:  Good morning, your Honor.  Frank |
| 5 | Balsamello for the United States. |
| 6 | THE COURT:  Mr. Balsamello, good morning to you. |
| 7 | Thank you.  Is anyone assisting you in the call today? |
| 8 | MR. BALSAMELLO:  No.  Just me. |
| 9 | THE COURT:  Thank you, sir. |
| 10 | And is Mr. Kirton on the line as well? |
| 11 | MR. KIRTON:  Yes, your Honor.  Marlon Kirton for |
| 12 | Mr. Reyes.  Good morning, your Honor, and happy new year. |
| 13 | THE COURT:  Good morning, sir, and happy new year to |
| 14 | you as well. |
| 15 | And representing The Daily News? |
| 16 | MR. LEISH:  Good morning, your Honor.  This is Matthew |
| 17 | Leish from Miller Korzenik representing Daily News and |
| 18 | Mr. Brown. |
| 19 | THE COURT:  Good morning to you as well. |
| 20 | Let me just take a moment.  I just want to get my |
| 21 | docket up on the screen, and unfortunately I am having these |
| 22 | computer issues this morning. |
| 23 | Okay.  Thank you very much. |
| 24 | Mr. Balsamello, I'm going to begin with you, sir.  It |
| 25 | would seem to me that under cases like *Lugosch* and the *Amodeo* |

L1K1REYA

series of cases, and perhaps cases such as *Newsday v. County of Nassau*, under the Second Circuit, that the documents that are sought by Mr. Brown and The Daily News are each judicial documents.  I understand them to be seeking the transcripts of the plea and sentencing and the sentencing submissions in this case.  Do you agree with me, sir, that they are judicial documents?  And if you do not, would you tell me what you believe them to be.

MR. BALSAMELLO:  I do agree with that.

THE COURT:  As a consequence of that, sir, does this mean that I am using the First Amendment right of access and not the common law right of access?

MR. BALSAMELLO:  I believe that is correct, your Honor.

THE COURT:  And as a result of that -- well, what is the government's view, sir, as to the presumptive right of access?

MR. BALSAMELLO:  Your Honor, I would have to pull up the case law, and I don't have it in front of me at the moment, and we haven't sort of extensively briefed the governing standard --

THE COURT:  Mr. Balsamello, excuse me.  My question was probably not sufficiently precise.

MR. BALSAMELLO:  Sure.

THE COURT:  My read of the presumption of access would

L1K1REYA

| | |
|---|---|
| 1 | be that there is a presumption of access and that it prevails |
| 2 | unless it is overcome by specific on-the-record findings that |
| 3 | sealing is necessary to preserve higher values and only if the |
| 4 | sealing order is narrowly tailored to achieve that aim.  And |
| 5 | lest you think I'm making this quote up, I am quoting from the |
| 6 | *Lugosch* opinion, and I believe as well similar sentiments are |
| 7 | found in *In re New York Times*, in *New York Civil Liberties* |
| 8 | *Union v. New York City Transit Authority*, and in the *Amodeo* |
| 9 | series of cases. |
| 10 | MR. BALSAMELLO:  I agree with that statement, your |
| 11 | Honor.  I thought you were inquiring as to sort of the |
| 12 | applications of it or more specifics regarding the application |
| 13 | to this case and comparisons to those cases, but I agree with |
| 14 | your statement of the law that you just set forth. |
| 15 | THE COURT:  Okay.  What I'm trying to do as an opening |
| 16 | matter, sir, is to make sure we all have the same views of the |
| 17 | law and how the law applies, and then we'll start talking about |
| 18 | the facts insofar as we can. |
| 19 | Mr. Leish, are you still there, sir? |
| 20 | MR. LEISH:  I am, your Honor. |
| 21 | THE COURT:  Mr. Leish, I was looking this morning |
| 22 | before the conference began at the docket in this case.  I |
| 23 | didn't see that you had filed a notice of appearance, but it is |
| 24 | sometimes the case that there is a delay in it getting |
| 25 | docketed.  Have you done so, or do you plan to do so in the |

L1K1REYA

1    very near term, sir?

2            MR. LEISH:  I have not done so, your Honor.  I have

3    one prepared.  I attempted to file it yesterday, and it seemed

4    to be trying to direct me to file as counsel for the defendant,

5    which I obviously did not want to do, so I need to talk to

6    someone at the ECF office to make sure I'm doing it correctly.

7    But I do have one prepared and I will file one.

8            THE COURT:  I appreciate that.  Thank you, sir.  And

9    now I understand.  And I'm sorry to say that's not the first

10   time I've heard of a hiccup of that particular type, so thank

11   you.

12           Sir, you've heard me speaking with the prosecutor

13   regarding the standards and regarding whether these are

14   judicial documents or not.  Seems to me, since he has agreed

15   with the law as I've stated it, that you might agree with that

16   as well, but let me hear from you if you have a different view

17   as to what the standards are in this case.

18           MR. LEISH:  I do agree with the general statement of

19   the law, your Honor, that you set forth.  It has to be narrowly

20   tailored to preserve an overriding or essential interest

21   sufficient to overcome the presumption of openness, and I would

22   add that it's clear under the case law that that standard

23   applies both to the transcripts themselves and to sentencing

24   submissions and documents as well.  So I think it sounds like

25   everybody is on the same page as to what the standard is here.

L1K1REYA

1          THE COURT:  And I did hear from Mr. Balsamello that he

2     considers all of these documents to be judicial documents, and

3     I do as well.  I think that's the fairest assessment of them.

4          One thing I wanted to confirm with you, sir, is

5     precisely what is being sought by the news, and that is the

6     transcripts of the plea and sentencing of Mr. Reyes and the

7     sentencing submissions from the government and the defense with

8     respect to Mr. Reyes?

9          MR. LEISH:  That is correct, your Honor.  And if I

10    could just clarify one point.  The letter submitted by the

11    government on January 7th seemed to indicate that The Daily

12    News was only seeking, or was only interested in those portions

13    of the documents and transcripts that expressly referred to

14    Mr. Epstein, and that is not correct.  Obviously the

15    Epstein-related portions are of particular interest, but the

16    Daily News's view is that everything concerning Mr. Reyes is of

17    public interest because he was Mr. Epstein's final cellmate and

18    therefore there's an interest in knowing everything that there

19    is to know about Mr. Reyes, whether or not Mr. Epstein is

20    specifically mentioned in any portion of a document or

21    transcript.

22          THE COURT:  Ah.  And you're actually anticipating one

23    of my questions, because the way in which Mr. Brown's initial

24    letter to me was phrased, there did seem to be a focus on

25    Mr. Reyes's relationship, however defined, with Mr. Epstein,

L1K1REYA

1    and so I too had an understanding that Mr. Brown's focus was on

2    discussions or mentions of Mr. Epstein in these documents.  So

3    just so that I understand you now, what you're saying is

4    actually no, Failla, it is broader, because Mr. Reyes, by dint

5    of being the former cellmate of Mr. Epstein, is himself someone

6    that is considered newsworthy and someone that is the subject

7    of Mr. Brown's interest.  Fair enough, sir?

8              MR. LEISH:  That is correct, and I agree that the

9    original letter may not have been completely clear on that

10   point, but that was the intent; the intent was to express that

11   because he was Mr. Epstein's final cellmate, therefore,

12   everything about him is a matter of public interest.

13             THE COURT:  I see.  Okay.  One of the questions I was

14   going to ask you is whether you accepted the government's

15   representation that there is nothing substantive regarding

16   Mr. Epstein that isn't either in the public domain or actually

17   in Mr. Brown's stories, and you might even agree with that, but

18   your point is that's not enough because it is about Mr. Reyes

19   that you wish to learn.  Okay.  I understand that.

20             MR. LEISH:  Yes.  And if I could just add --

21             THE COURT:  Yes, sir.  Yes, Mr. Leish.

22             MR. LEISH:  I'm sorry.  If I could just add one more

23   on that point.  It is correct that we're interested in

24   everything, but as to the specific references to Mr. Epstein,

25   we understand the government says there's nothing else of

L1K1REYA

1  substance.  We then have the government's letter with two pages

2  of items that apparently may relate to Mr. Epstein redacted.

3  We don't know what they are.  And with respect to what's of

4  public interest or not, even if the general facts have already

5  been disclosed, there may be some detail in here that the

6  government may think, oh, this is just duplicative of what's

7  already known but that a news reporter might find interesting.

8  We just have no way of knowing without knowing what's in there.

9  So I'm at a bit of a handicap in answering that question.

10  THE COURT:  Of course, of course, and I understand

11  that, sir.

12  Let me please then return to Mr. Balsamello for a

13  moment.  Mr. Balsamello, were you present, sir, at the plea and

14  at the sentencing of Mr. Reyes?

15  MR. BALSAMELLO:  Yes, your Honor.  I handled both of

16  those, and I submitted the government's sentencing letter.

17  THE COURT:  Thank you.  Sir, were the courtrooms

18  sealed for either of those proceedings?  It may have been the

19  case that because of the timing of the plea or the timing of

20  the sentencing that no one else showed up but those of us who

21  were involved in the proceedings, but I don't believe that

22  there was a request from either the government or the defense

23  for sealing of either of those proceedings.

24  MR. BALSAMELLO:  The courtroom I don't believe was

25  sealed.  The plea was definitely done live, and we knew there

L1K1REYA

was no one else present in the room.  We did move, and your

Honor granted, delayed docketing and sealing of the transcript,

but the courtroom itself was not closed for the plea.

As to the sentencing, that was done during COVID.  It

was a phone appearance.  My recollection is that that also was

not a sealed telephonic courtroom, but again, your Honor

granted the motion to seal and delay docketing of the

transcript.

THE COURT:  Do you consider delayed docketing an

analogue, either legally or factually, to a sealed courtroom?

MR. BALSAMELLO:  I think that as a practical matter,

it achieves the purpose of ensuring the goals that we set forth

on the record at the time we request the delayed docketing and

those I think are often the same objectives that would be

served by sealing the courtroom.  I don't think legally they

are analogous; I don't think legally they are analyzed the same

way, though admittedly I haven't researched or analyzed that

particular issue, but to the extent there's a comparison to be

drawn, I think that they are -- they would be done for the same

reasons.  And so to the extent your Honor heard argument as to

why we requested delayed docketing and sealing of the

transcripts, those would have been similar or the same

arguments that would have been made for sealing the courtroom,

but again, given the circumstances, there wasn't a need to seal

the room itself.

L1K1REYA

1          THE COURT:  How, if at all, should the delayed

2     docketing impact my analysis?  I think you were beginning to

3     answer that because I think I'm understanding you to say that I

4     should consider the reasons why delayed docketing was sought in

5     ascertaining whether the presumption of access has been

6     rebutted to any degree, but I just want to make sure I

7     understand your arguments.

8          MR. BALSAMELLO:  I think that's right, your Honor, and

9     I think we can elaborate on those reasons.  I think my letter

10     of January 7th attempted to do that, but I do think your Honor

11     can look back at the reasons articulated at the time as reasons

12     that we now believe that unsealing is inappropriate.  I think

13     that to the extent your Honor made on-the-record findings and

14     heard proffers from counsel about the delay of docketing, those

15     same rationale I think carry over here.

16          THE COURT:  Mr. Kirton, I wanted to understand, sir,

17     whether today you were joining in the government's application

18     and letting Mr. Balsamello take the laboring oar or whether you

19     also wanted to be heard separately on any of the issues that

20     I've been discussing with either of Mr. Balsamello or

21     Mr. Leish.

22          MR. KIRTON:  We join the government's application.  I

23     just want to add one factual note.

24          THE COURT:  Yes, please, sir.

25          MR. KIRTON:  I've been in contact with my client's

L1K1REYA

1  family.  It's their view that Mr. Reyes is not a celebrity,

2  he's not a person of interest, and should details of his

3  cooperation with the government become public, in terms of who

4  he cooperated against, how many persons he cooperated against,

5  in terms of which group he cooperated against, my client's

6  family will be in danger.  It's my information that they still

7  live in New York City, and one or more of the targets of my

8  client's cooperation certainly know where they live, and they

9  believe that they may be at risk if the details of that

10  cooperation becomes public.  Mr. Reyes is not a celebrity.  His

11  contact with Mr. Epstein was basically coincidental.  He was on

12  his way from one facility to the next and he happened to, for a

13  brief time, be a cellmate with a person I describe as the most

14  notorious defendant in the Southern District of New York since

15  the terrorist cases of the '90s.  My client is not a celebrity,

16  and his family does not want to be put at risk based on this

17  coincidental meeting.

18         THE COURT:  I wonder, Mr. Kirton, if I could just

19  pause for a moment, please.

20         One thing that I didn't do at this proceeding -- and I

21  wanted to and so I'm going to do it now, and I'm going to ask

22  for the parties' indulgence -- is I did want to extend my

23  condolences and the condolences of my staff to Mr. Reyes's

24  family.  I have a very strong memory of the sentencing.  I have

25  also a very strong memory of Mr. Reyes's many appearances

L1K1REYA

| | |
|---|---|
| 1 | before me and how he changed and grew and progressed through |
| 2 | the experience, and it is a singular sadness and disappointment |
| 3 | to me that, having gotten himself in a better place, he was |
| 4 | never able really to achieve the potential that he then had. |
| 5 | So please, please communicate to the family my deepest |
| 6 | condolences to them on their loss. |
| 7 | MR. KIRTON:  I will, your Honor.  Thank you. |
| 8 | THE COURT:  Okay.  And Mr. Kirton, I think I do |
| 9 | understand.  I did not mean to cut you off if there were other |
| 10 | arguments you wished to make, but I think I understood the |
| 11 | tenor of what you wanted to communicate to me, which is |
| 12 | something that's very specific that you have access to by dint |
| 13 | of your representation of Mr. Reyes previously. |
| 14 | MR. KIRTON:  That's correct, your Honor. |
| 15 | THE COURT:  Thank you. |
| 16 | Mr. Balsamello, one of the things that I think is an |
| 17 | option to me is producing either the transcripts or the |
| 18 | sentencing submissions in redacted form.  I'm not trying to |
| 19 | give you a Hobson's choice, where you have to explain on the |
| 20 | record what it is you have in the redacted version of your |
| 21 | letter to me.  You can refer to it more obliquely.  But why |
| 22 | can't, for example, the plea and sentencing transcripts be |
| 23 | produced in redacted form?  We'll start with those. |
| 24 | MR. BALSAMELLO:  I think, your Honor, the difficulty I |
| 25 | had -- and we considered that, and I sat down and looked at the |

L1K1REYA

1    transcripts and the submissions and started to think about how

2    to do that, and came away with the belief or the concern that

3    either we'd be left with, if we were talking about only

4    unredacting the matters that related to Mr. Epstein, and I

5    realize that may not actually now be the tailored focus of the

6    motion --

7              THE COURT:  Correct.

8              MR. BALSAMELLO:  -- when I initially looked at it with

9    an eye towards that, we would be left with either documents

10   that have pages and pages and pages of black redaction boxes

11   and then a short paragraph or two to three sentences just

12   floating in an otherwise enormously redacted document, and as

13   your Honor has seen in the unredacted letter, while the

14   descriptions that relate to Mr. Epstein are almost two pages,

15   they are largely redundant; they are not particularly

16   substantive statements about anything.  So that was one issue

17   was just the redacted documents were so heavily redacted that

18   they left virtually nothing meaningful to look at.

19             When I then looked at the ways in which the redactions

20   could be stripped back, obviously, your Honor, your deputy

21   calling the case could be unredacted, introductions could be

22   unredacted, things like that, but as soon as we would get into

23   context, it would raise the concern for me that Mr. Kirton

24   alluded to and that I go into in a little more specificity in

25   my letter, that once that context is revealed and depending on

L1K1REYA

1    how much substance comes along with it, it does disclose things

2    that are entirely unrelated to Mr. Epstein and that could

3    expose Mr. Reyes's family to safety issues.

4         I do also think there are a number of places

5    throughout the documents and the transcripts where there are

6    deeply personal matters and health issues relating to Mr. Reyes

7    that come up.

8         And so those were sort of my problems with the

9    redacting; either it was going to be so redacted as to be

10   meaningless or starting to bleed into the areas where the

11   government has the concerns that we articulated.  I understand

12   that now Mr. Brown and The Daily News, that their position is

13   that Mr. Reyes just generally is now a person of interest.  I

14   do think that's a bit -- I take them at their word they now

15   have interest in Mr. Reyes because he was a cellmate of Jeffrey

16   Epstein, but I don't believe that that now converts Mr. Reyes's

17   personal background, health, upbringing, and, frankly, even

18   other matters that are sensitive throughout those documents,

19   brings them into any sort of public interest.

20        I realize -- and we knew -- I realized when they made

21   the submission that your Honor may look for ways to craft

22   redactions, and if that is the Court's directive, I would try

23   to implement it as faithfully as possible, but the problem was

24   figuring out where a line could be drawn so that the documents

25   were responsive but also not exposing the risk that we

L1K1REYA

1    articulate.

2                THE COURT:  I see.

3                Mr. Leish, turning to you for a moment, sir,

4    Mr. Balsamello just spoke about sensitive and personal

5    information regarding Mr. Reyes.  I mentioned Mr. Kirton echos

6    his view.  I did preside, sir, over the plea and over the

7    sentencing, and there is deeply personal information, including

8    medical information, that was discussed, and it was at that

9    time pertinent to the plea and pertinent to the sentencing.  Do

10   you believe that that ought to be disclosed; and if so, why?

11   And I guess we'll just start with that.

12               MR. LEISH:  Yes, your Honor.  So, you know, without

13   wishing to in any way be insensitive to people's deeply held

14   feelings about their family members and their personal

15   information, I do think that is something that is subject to

16   disclosure.  Privacy interests can be something that can be

17   withheld, it can be an essential interest in certain

18   circumstances that overcomes the right of access, but Mr. Reyes

19   is deceased, and I've actually looked to see if there are any

20   cases discussing whether that type of privacy interest survives

21   postmortem in this context.  I can't find any.  But in an

22   analogous context, the civil right of privacy, invasion of

23   privacy claims, intrusion claims, do not survive postmortem.

24   This is a personal right of the person whose rights are at

25   issue, and they do not survive his passing.  So, you know, if

L1K1REYA

that's an analogous situation, if that helps to sort of think
about this, I don't think there's any real surviving right of
privacy here.

        I understand the family's rights might be more
significant from a legal perspective here.  Certainly if
anybody's life is going to be in jeopardy as a result of
disclosing anything, I will acknowledge, that's a serious
interest here.  But I would just point out that the fact that
Mr. Reyes cooperated is public, the names of those
co-defendants are public, and I understand that there are ten
people in the case and the case is closed as to eight and one
more is awaiting sentencing, so certainly those people know
that they've been sentenced, they know that Mr. Reyes has
cooperated, and again, I'm not aware if there are other ongoing
investigations that might implicate other individuals, but I
would certainly think the fact that some of this is already
public and the fact that some of these people have already been
convicted and sentenced should weigh heavily here, and if there
are a few areas where disclosing a particular name or a
particular fact would put somebody's life in jeopardy or would
jeopardize an ongoing investigation, that seems to me that
would be a candidate for redaction rather than withholding the
entire document.

        THE COURT:  Okay.  Thank you.

        Mr. Kirton, on this particular issue, do you wish to

L1K1REYA

1    be heard?

2            MR. KIRTON:  Your Honor, my client had a number of

3    medical issues.  He had a pretty serious drug problem for most

4    of his adult life.  And I don't think that -- I mean, I spoke

5    to the family primarily about the safety issues, but they were

6    also concerned about Mr. Reyes being a celebrity or public

7    person or anything about Mr. Reyes being public.  So I did not

8    speak with them specifically about his medical condition; I

9    spoke to them about safety.  But they were also concerned about

10   Mr. Reyes not being a celebrity based on his chance encounter

11   with Mr. Epstein, so I imagine that also includes his personal,

12   private medical conditions, which are quite numerous.

13           THE COURT:  And so let me just probe that with you a

14   little bit more, sir.  And I'm neither agreeing nor

15   disagreeing; I am just probing at this point.  Let's say that

16   today, sir, or let's say that last night you won that Powerball

17   lottery, that $800-900 million lottery.  Perhaps I might not be

18   speaking to you today, sir, if that were the case.  But by

19   accident, without really wanting to make yourself a celebrity,

20   you become a celebrity.  It's just fortuitous; it is not

21   something you sought, but it happened nonetheless.  And if

22   folks want to understand better your life, you are now a public

23   figure, not through any -- well, by dint of buying a lottery

24   ticket.  I'm just wondering if the same analogy holds true for

25   Mr. Reyes.  You know, Mr. Reyes was not detained hoping he'd be

L1K1REYA

1    bunked with someone with some celebrity or notoriety, but he

2    was.  And so I'm just not sure how much weight I can give to

3    his family's desire, or even, you know, if he ever expressed a

4    desire to sort of fade into the woodwork.  I'm just not sure

5    that I can recognize that, given that, by fortuity, he was

6    assigned to Mr. Epstein as a cellmate.

7         MR. KIRTON:  Well, two responses to that.  I think

8    when one buys a lottery ticket, I think there's an

9    understanding that if you win, your name and identity become

10   public, because I believe -- I mean, I've actually never played

11   Lotto, but I understand that if you win a large amount of

12   money, there is a process or some sort of ceremony where the

13   name and identity of the winner or winners is announced.  So I

14   think inherent in actually buying a lottery ticket, you kind of

15   consent to being a public figure should you basically hit the

16   jackpot and win a large amount of money.

17        I think criminal defendants, I think they understand

18   that their cases are a matter of public record -- you know, who

19   they are, what they're being charged with, and, if they're

20   convicted, what they're convicted of, and what their sentence

21   is.  So I think to the extent that everybody knows who he is

22   and what he pled guilty to, what his sentence was, I think all

23   criminal defendants kind of acknowledge or certainly consent to

24   that information being public.

25        I think cooperators are a bit different.  I think

1    there are certain elements of that process that that defendant

2    would like to remain private.  And I think with either

3    defendant, whether it's a regular, normal defendant or a

4    cooperator, I think personal medical information is something

5    that neither defendant would like to be public.  Certainly they

6    would like the Court to know and the prosecutors to know, and

7    of course the probation department to know, to the extent that

8    it's relevant for their sentencing, but I don't think that they

9    want personal medical information to be part of the public

10   record, whether they're a cooperating defendant or just a

11   regular defendant.  So I just make that distinction in terms of

12   information that they could expect and should expect to be

13   public and information that I don't think that they would

14   expect to be public, even if that information helps them in

15   their case in some way.

16              THE COURT:  I see.

17              Okay.  Mr. Balsamello, do you wish to be heard on the

18   issue?

19              MR. BALSAMELLO:  Your Honor, I think what I'd say

20   first is that the most pronounced concern the government has

21   continues to be the safety issue, and I think we've referenced

22   several times here cooperation, and Mr. Brown has already

23   reported that Mr. Reyes spoke with law enforcement relating to

24   Mr. Epstein.  That said, to the extent there is more to be said

25   regarding cooperation or any specifics, those are not currently

L1K1REYA

| | |
|---|---|
| 1 | public, and I think it even goes beyond whether there is a |
| 2 | specific name or defendant or investigation in these documents, |
| 3 | but simply the scope of any potential cooperation and what it |
| 4 | entailed, I think on paper, in a format that people in the |
| 5 | community could get, would present a safety risk to Mr. Reyes's |
| 6 | family.  I think it's well known that often inmates and |
| 7 | defendants and folks at liberty who would do harm to potential |
| 8 | witnesses -- and I'm not confirming the scope of anything, I |
| 9 | don't want to go into the very things I'm arguing should not be |
| 10 | unsealed, but -- that people who might act on such things often |
| 11 | do want paperwork, want to see something documented of |
| 12 | cooperation to know that they're acting for a reason.  And so I |
| 13 | do think there are matters in these documents that raise that |
| 14 | concern. |
| 15 | As to the health and personal issues, I don't have in |
| 16 | front of me -- and I'm trying to quickly pull it up and find -- |
| 17 | the exact rule, but I believe that under the rules of criminal |
| 18 | procedure even, there are certain matters that are typically |
| 19 | redacted from documents that we file on ECF, and this is coming |
| 20 | to mind because of the number of compassionate release filings |
| 21 | of late and how many of those implicate health issues. |
| 22 | Looking at the rule, which I just pulled up, I don't |
| 23 | know the degree to which sensitive health information sort of |
| 24 | falls in that category of -- for example, we would never file |
| 25 | someone's Social Security number.  But I do think, even after a |

L1K1REYA

defendant's death, there is still an interest to be spoken for

regarding sensitive aspects of their personal lives that are in

documents and in documents that at the time of their filing

were expected to be and were accepted under seal.  I think

there is an interest there still.

THE COURT:  Okay.  Thank you.

Mr. Balsamello, just to conclude, are there any other

arguments that you wish to make that you believe I have not

fully intuited from either your presentation today or your

written submissions?

MR. BALSAMELLO:  No, your Honor.  I don't think so.

And obviously the Court has these documents and you were

present for all of these proceedings, so I appreciate and

understand that you know what's at issue, even things that are

not in the public record at the moment, and I don't think

there's anything else for the government to add.

THE COURT:  Thank you.

Actually, let me just follow up on that.  One thing I

was a little bit surprised to hear in today's conversation is

the acknowledgment by Mr. Kirton that Mr. Reyes was a

cooperating witness, and that is because to me there is a

distinction between his niece saying he cooperated and

something more formal than that.  It seems to me that you and

Mr. Kirton have decided to confirm -- and I'm not going to

confirm or deny it, I just want to hear you say it -- that

L1K1REYA

1      Mr. Reyes was a cooperating witness.

2              MR. BALSAMELLO:  I have not intended to confirm that.

3      I'm saying to the extent there's already been public statements

4      regarding cooperation with investigators on the Epstein matter

5      and to the extent Mr. Brown has reported that he cooperated

6      against co-defendants, again, Mr. Brown's report is already

7      public, and I do think, though, there is a difference between

8      that sort of reporting and judicial documents that would

9      confirm as much, and I did not intend to confirm or deny the

10     scope of any cooperation beyond obviously that, you know,

11     Mr. Reyes was a cellmate of Mr. Epstein, and I think we have

12     confirmed that he spoke with investigators regarding that

13     matter, and I have not intended to put on the record anything

14     about any contact with law enforcement beyond that.

15             THE COURT:  Thank you.

16             Mr. Kirton, was that the same for you, sir?

17             MR. KIRTON:  Yes, your Honor.  I received a number of

18     calls from Mr. Brown, and the only thing I confirmed was the

19     fact that I represented Mr. Reyes; never sat for an interview

20     with Mr. Brown or anybody else regarding this case.  So I

21     certainly confirmed that I represented Mr. Reyes.  That's

22     pretty much all I'm willing to confirm at this point.

23             THE COURT:  I see.  Thank you.

24             Mr. Leish, final thoughts, sir?

25             MR. LEISH:  Thank you, your Honor.

L1K1REYA

1      I would just say, on the issue of whether this is

2   public or not, two things.  Mr. Brown's article reported, among

3   other things, that Mr. Reyes had been transferred to a Queens

4   jail that was specifically designed to hold cooperating

5   witnesses, so that is a public fact.  Whether it's confirmed by

6   the government and defense or not, I think it's out there.

7      The other thing I would say on the question of whether

8   the fact of cooperation is something that can be withheld, I

9   would direct the Court to -- there was a case, *United States v.*

10  *Milken*, back in 1991.  I believe in that case the court

11  actually allowed redactions.  But the court held in that

12  case -- I'm quoting here -- "The public should have access to

13  information as to the general nature and extent of defendant's

14  cooperation if disclosure could be made without jeopardizing

15  ongoing or future investigations, but information that

16  identifies the target, subject, or status of a particular

17  investigation must be redacted so long as that information has

18  not previously been publicly revealed."  So I would submit at

19  the very least here the fact that he cooperated and the general

20  nature of his cooperation is not something that should be

21  withheld, and I would go further and say, some of the details

22  have been publicly revealed as well, but to the extent they

23  haven't been, there can be sort of targeted redactions of names

24  and status, to the extent necessary.

25      THE COURT:  Let me just discuss that with you a little

L1K1REYA

1    bit more, Mr. Leish.  And let me explain.  I'll be very

2    transparent in this regard.  Not to suggest I haven't been

3    transparent in this conference.  But my concern is this:  I

4    believe that there are ongoing or potential matters that exist

5    out there, and I believe that Mr. Reyes's family would be at

6    risk were information to get out.  What I'd like to probe is:

7    What if disclosing the fact of cooperation itself enhances or

8    causes a risk to Mr. Reyes's family because folks, upon

9    learning that, will then wonder whether they are the person

10   against whom, or about whom he may have given information?

11   That's a concern that I have.  So what you're saying is,

12   according to *Milken*, the fact of cooperation is fine; you just

13   can't do the scope.  My concern is, if you mention the fact and

14   folks are left to wonder whether they are someone about whom a

15   person has spoken, that there might be a risk of harm or

16   violence to the family.  Your response to that, please, sir.

17           MR. LEISH:  Well, your Honor, that's obviously a tough

18   question because there's sort of two different issues being

19   conflated here.  There's, is the cooperation itself a reason

20   for redacting and is the risk to the family reason to redact,

21   and certainly the fact that a witness or family member would be

22   in jeopardy is a potential reason to withhold information.  I

23   concede that.  But in this case the fact that he's a cooperator

24   is already public, and I understand there's no document saying

25   that, but it's been reported.  That's the only reason he was in

L1K1REYA

1    that Queens jail.  It wasn't denied by the government or

2    defense counsel when they were contacted for Mr. Brown's

3    article.  And I just don't think there's a real -- I don't

4    think it can be plausibly denied that he was a cooperator.  So

5    whether that is something that's said in the transcript with

6    all the details redacted as opposed to simply being reported

7    and attributed to sources and Bureau of Prison's records, which

8    is what we have now, to me that doesn't rise to the level of

9    being narrowly tailored to protect the government interests.  I

10   mean, the horse is already out of the barn in that respect.  I

11   will certainly concede that if there's something specific that

12   will put a family member in danger, that is a suitable

13   candidate for redactions.

14            THE COURT:  Thank you.  One moment, please.

15            Counsel, I believe I've gotten all of your arguments.

16   I'm just going to ask one last time if there's anyone with what

17   my judge used to call undelivered argument.  If so, please tell

18   me; but if not, what I'd like to do is just pause for a moment,

19   just collect my thoughts and my notes, and then have you wait

20   for a few moments, I'll put you on hold for a couple minutes,

21   and then I'll get back to you as soon as I can with a decision.

22            Thank you.  Hearing nothing from anyone, I will be

23   putting you on hold at this time.  Thanks very much.

24            MR. LEISH:  Thank you, your Honor.

25            (Recess)

L1K1REYA

1          THE COURT:  Counsel, this is Judge Failla, and I've
2     returned to the call.
3          Mr. Balsamello, are you still there?
4          MR. BALSAMELLO:  I am.
5          THE COURT:  I thank you.
6          Mr. Kirton, are you still there?
7          MR. KIRTON:  Yes, your Honor.
8          THE COURT:  Mr. Leish, are you still there?
9          MR. LEISH:  I am, your Honor.
10         THE COURT:  Thank you very much.
11         I want to just begin with the applicable law, because
12    I do think that we seem all to be in agreement on it.
13         It is very clear that the public and the press have a
14    qualified right of access to judicial documents and to records
15    filed in civil and criminal proceedings.  The case that I've
16    been citing throughout this matter is *Lugosch v. Pyramid*
17    *Company of Onondaga*, 435 F.3d 110, a Second Circuit decision
18    from 2006.  You've heard me refer to the *Amodeo* cases, one of
19    which *Amodeo I*, is at 44 F.3d 141, and later on we get to
20    *Amodeo II*, which is 71 F.3d 1044.  Other cases that I have
21    looked at include *Press-Enterprise Co. v. Superior Ct. of*
22    *California for Riverside County*, 478 U.S. 1; *Matter of New York*
23    *Times Company*, 828 F.2d 110, Second Circuit decision from 1987;
24    *Newsday v. County of Nassau*, 730 F.3d 156, a 2013 decision from
25    the Second Circuit; and cases of that type.  It does appear

L1K1REYA

1    that we are in agreement that the transcripts and the

2    sentencing submissions that are sought are judicial documents

3    and that the qualified First Amendment right applies.  And so

4    I've looked at those.  And finding that there is a presumptive

5    right of access, what I must do is, either it prevails or it is

6    overcome by specific on-the-record findings that sealing is

7    necessary to preserve higher values and only if the sealing

8    order is narrowly tailored to achieve that aim.  From my

9    perspective there are three issues that have been raised and

10   discussed by the parties today, and I'll address each of them

11   separately.

12            There is a question and there is discussion about

13   Mr. Reyes's cooperation, and I'm not sure what the parties

14   wanted to communicate to me today, but looking at my notes, it

15   is quite clear that Mr. Kirton acknowledged that Mr. Reyes was

16   a cooperator, and so I don't see how I am going to be able to

17   refrain from disclosing that information.  But that said, I am

18   very concerned about disclosing the scope of that information

19   because knowing what I do know -- and that includes both my

20   information from presiding over this case and the information

21   that I obtained in the government's unredacted submission in

22   January, earlier this month -- I am confident and I will make

23   the finding on the record that disclosure of the scope,

24   disclosure of the specifics will compromise ongoing and

25   contemplated government investigations, and will place at risk

L1K1REYA

Mr. Reyes's family.  And so information about the details of

any cooperation, other than perhaps as it pertains to

Mr. Epstein, cannot be disclosed, because I'm not going to risk

the family.

        The other category of information here would be health

and other sensitive information about Mr. Reyes, and I was

guided initially by the *Amodeo II* decision, which said

specifically, in determining the weight to be accorded to an

assertion of a right of privacy, courts should first consider

the degree to which the subject matter is traditionally

considered private rather than public.  Financial records of a

wholly owned business, family affairs, illnesses, embarrassing

conduct with no public ramifications, and similar matters will

weigh more heavily against access than conduct affecting a

substantial portion of the public.  And it did seem to me that

information about Mr. Reyes's medical conditions and certain

aspects of his past were in that category of information that's

not traditionally public and ought not to be disclosed.  But I

do want to reconsider that position in light of Mr. Leish's

argument to me today that any such concerns were vitiated by

Mr. Reyes's passing.  I just want to look into that a little

bit more.

        So the issue becomes:  What do I do.  And it is my

intention to release a redacted version of the plea and the

sentencing transcripts.  Now the scope of the redactions might

L1K1REYA

| | |
|---|---|
| 1 | be substantial, but that's -- Mr. Leish, I am telling you that, |
| 2 | to the extent I am redacting this information, it is because I |
| 3 | am concerned about compromising government investigations, |
| 4 | exacerbating or causing a risk to the family members, |
| 5 | obviously, and sadly, not to Mr. Reyes, or because I have |
| 6 | convinced myself upon further review that my initial position |
| 7 | was correct about the sensitive medical information not having |
| 8 | to be disclosed.  So those are the categories of information |
| 9 | that I would be redacting.  And I just want to research a |
| 10 | little bit more that last category about sensitive information. |
| 11 | In looking at the defense sentencing submission, it is |
| 12 | my view that that submission can itself be redacted and |
| 13 | published in a redacted form. |
| 14 | As I looked at the government's sentencing submission, |
| 15 | I found it very difficult to redact.  I looked at it with a |
| 16 | view to redacting it, and I didn't think that I could.  I will |
| 17 | look at it again, but if I cannot, it's because the redactions |
| 18 | are such that there is almost nothing that remains. |
| 19 | And so that is my decision on this motion. |
| 20 | Mr. Balsamello, any questions, sir?  I should tell |
| 21 | you, as a matter of just logistics, I want to look at that |
| 22 | remaining issue about postmortem survival or the postmortem |
| 23 | sensitive medical information, and after I'm done with that, I |
| 24 | will issue redacted versions of these documents.  So that's my |
| 25 | plan. |

L1K1REYA

1        Do you, Mr. Balsamello, have any questions or issues

2    that require clarification on my part?

3        I'm sorry, sir.  You may have to unmute yourself.

4        MR. BALSAMELLO:  I don't, your Honor.  You obviously

5    are aware of the sensitivities, and I think we defer to your

6    wisdom in terms of the scope of redactions, so we have nothing

7    further.

8        THE COURT:  Thank you.

9        Mr. Kirton, anything further?

10        MR. KIRTON:  No, your Honor.  Thank you.

11        THE COURT:  Thank you.

12        Mr. Leish, anything further?

13        MR. LEISH:  Nothing further.  Thank you, your Honor.

14        THE COURT:  All right.  I thank you very much.

15        Mr. Balsamello, it's my assumption that the government

16    will obtain a transcript of this conference.  Please do so,

17    with whatever speed you think is appropriate.

18        With that, I wish to each of you safety and good

19    health during this continued pandemic.  I thank you, and we are

20    adjourned.

21        ALL COUNSEL:  Thank you, your Honor.

22                              o0o

23

24

25